Argued February 6; reversed March 27, 1945

ROSS *v.* HAYES ET AL.

(157 P. (2d) 517)

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*James Arthur Powers,* of Portland, for appellant Frank Hayes.

*Francis E. Marsh* and *R. A. McCourry,* both of McMinnville (Vinton, Marsh & Marsh, of McMinnville, on the brief), for respondent.

BAILEY, J.  Plaintiff, Mildred Ross, instituted this action against Frank Hayes, Consolidated Freightways, Inc., and Albert E. Ault, to recover damages for injuries sustained by her when the automobile in which she was riding as a guest of Hayes collided with the automobile truck owned by the Consolidated Freightways, Inc., and driven by Albert E. Ault.  From a judgment in favor of plaintiff and against all of the defendants, the latter appealed.  Before oral argument, the appeal was dismissed as to defendants Consolidated Freightways, Inc., and Albert E. Ault.  We therefore are concerned only with the Hayes' appeal.

The first error assigned by defendant Hayes is the refusal of the court to grant his motion for a directed verdict.  The ground of the motion was that there was no evidence of gross negligence on the part

of Hayes. In discussing this assignment, we must consider the evidence in the light most favorable to plaintiff.

The accident occurred near the town of Algoma in Klamath county, about 10:30 in the forenoon of December 27, 1940. Defendant Hayes, Mrs. Cleata Hayes, his wife, Mildred Ross, who was a niece of Mrs. Hayes, and Mrs. Mary Wing, left Junction City, Oregon, between 5 and 6 o'clock in the morning of December 27, for Los Angeles in a Dodge sedan which was owned and driven by Mr. Hayes. They proceeded south over the Pacific highway to Goshen, Oregon, and thence over the Willamette highway, which crosses the Cascade mountains and connects with The Dalles-California highway at a point some 100 miles southeast of Eugene. From there they traveled in a southerly direction over The Dalles-California highway. As they were passing through an S curve, near Algoma, the Dodge suddenly swerved clock-wise across the highway and skidded sideways 75 or more feet. The rear of the Dodge collided with the front of the Consolidated Freightways' truck, which was approaching from the opposite direction, causing the Dodge to skid counter-clockwise and come to rest alongside of the truck.

The truck was transporting a Pontiac coupe, which was tilted in the air at an angle of approximately 45°. Due to the violence of the impact the Pontiac was hurled from the truck and landed on the Dodge, crushing the top of the latter car.

At the time of the accident Mrs. Wing was in the front seat with the driver. Plaintiff and Mrs. Hayes were in the rear seat, plaintiff sitting on the left side. All four of the occupants were "knocked unconscious".

Where the accident occurred the entire twenty-foot width of the oiled macadam pavement for a distance of 100 to 150 feet was covered with frost, making the road surface extremely slippery. The frost on the highway "doesn't show any particular color; just looks clear." At times it can be seen, depending somewhat on the direction in which one is looking. "Lots of times you can't see it until you are right on top of it." Defendant Ault testified that he did not have any trouble in seeing the ice at the place of the accident, but he did not say where he was when he first saw it. Neither defendant Hayes nor any of the passengers in the Dodge car noticed the frost or ice on the pavement before the car started to skid.

From 4:25 p. m., December 26, to 4:25 p. m., December 27, 1940, the temperature at Klamath Falls, 11 or 12 miles to the south of the place of the accident, ranged from 30° to 40° above zero. On the day that the accident occurred, the sun was shining and wherever there was frost on the surface of the highway it soon disappeared after being exposed to the rays of the sun. However, up to the time of the accident the place where the collision occurred was shaded.

The S curve above referred to was described as "not a very steep curve at all. I wouldn't say it was a steep curve, just a modest curve." Plaintiff estimated that defendant Hayes was driving from 40 to 45 miles an hour when he "went into this curve." She further stated that as they entered the curve the car was partly to the left of the center line. There were signs along The Dalles-California highway warning motorists that the pavement was slippery when wet or frosty. There was no such sign closer than one mile north of where the accident occurred.

According to plaintiff, there is other evidence in the case tending to prove that the accident was caused by the gross negligence of defendant Hayes. Therefore we shall refer now to that evidence.

It rained for a short time after Mr. Hayes and his party left Junction City. From about a mile west of the Cascade tunnel to a point on The Dalles-California highway, some distance south of Chemult and from 20 to 25 miles north of the place of the accident, the surface of the roadway was covered with packed snow, making it slippery in places.

After leaving Chemult and while on the snow-covered highway, Mr. Hayes attempted to pass a truck which was traveling in the same direction. He sounded his horn several times, turned to his left and started to pass. As he came along the side of the truck the driver thereof failed to yield the right of way. Hayes thereupon applied his brakes, causing the car to skid into the snowbank along the highway. Miss Ross thus explained the incident:

"We were going along the highway and we came up behind a transport truck and Mr. Hayes wanted to pass the truck, and so he attempted to and as we came along the rear wheels of the truck we saw that the truck driver didn't know that we were there, because he was out across the road, and Mrs. Hayes suggested that he not pass at that time but wait until he knew that the driver realized that we was behind him, and Mr. Hayes continued to try to pass the truck and ran into the snow bank.

✸ ✸ ✸ ✸ ✸

"Q. Now, did I understand you to say at the time that Mr. Hayes drove up behind this truck, before he attempted to pass or in the act of passing, his wife objected to him passing or told him not to pass; is that right?

"A. Yes.
"Q. And he continued to pass anyway, did he?
"A. He did.

\* \* \* \* \*

"Q. Well, did either of you say anything to Mr. Hayes about it? [passing the truck]
"A. No, Mrs. Hayes did that.
"Q. Just what did she say to him?
"A. She said that she wished he wouldn't pass then, that he would fall behind and wait.
"Q. And what did Mr. Hayes say
"A. Mr. Hayes continued to pass.
"Q. In other words he didn't say anything; he just kept on going?
"A. He just kept on blowing the horn and attempting to pass the truck."

Miss Ross was unable to estimate the distance between where the snow ended and the place of the accident. She stated that there were "icy places" along the highway between those points. Her testimony in this respect is as follows:

"Q. From the time you ran out of the snow to the place of the accident will you describe the condition of the road between those points?
"A. Well, we left the snow and there were icy places on the road, but not snow.
"Q. What was the manner in which Mr. Hayes drove along there? Describe how he was driving at that time.
"A. He was driving about 40 or 45.
"Q. After you left the snow did Mr. Hayes experience any trouble with the car?
"A. Well, that was the way I knew it was icy, because I felt the car slide several times; it was slipping.

\* \* \* \* \*

"Q. Were you in a position there—I mean your position in the car—so that you could see the roadway itself immediately in front of the car?

"A. No, not immediately in front. I could see farther out ahead.

"Q. Did you notice any ice on the pavement?

"A. No, I didn't.

On cross-examination, she gave the following testimony:

"Q. Now you have testified that you recall several occasions when you felt the car slipping. Am I correct in understanding that those occasions were once where the car was apparently on ice as distinguished from snow?

"A. Yes, I believe so.

"Q. Am I correct also that there was no occasion on which you ever made any protest of any sort to Mr. Hayes in regard to the manner in which he was driving?

"A. Not directly, no.

"Q. What do you mean by not directly?

"A. When we were passing the truck Mrs. Wing and I both were discussing whether or not we should continue to pass, because it was dangerous there, and that would be indirectly, wouldn't it?

"Q Well, did either of you say anything to Mr. Hayes about it?

"A. No, Mrs. Hayes did that.

\* \* \* \* \*

"Q. Was there any other occasion on the trip from Junction City to the point where this accident occurred when anybody was discussing the manner in which Mr. Hayes was driving the machine?

"A. Do you mean criticizing?

"Q. Yes.

"A. Well, we were constantly discussing road conditions.

"Q. What discussion was that?

"A. We were talking about the snow that we were passing, and when we slipped we all felt that.

"Q. You would discuss the slipping, would you?

"A. We mentioned that.

"Q. Did Mr. Hayes ever say anything about the car slipping on the ice?

"A. What do you mean?

"Q. Did Mr. Hayes make any comment that you remember on this trip of the car slipping at any time when it went over ice?

"A. No, but he surely knew it.

"Q. Then if I am correct there was just the one time when there was a direct conversation that you recall between Mrs. Hayes and Mr. Hayes about the attempted passing of the truck? Is that right?

"A. That is the one that stands out in my memory, yes.

"Q. Do you think there may have been other occasions when anyone in the car said anything to Mr. Hayes about the speed at which he was traveling?

"A. I think Mrs. Hayes could have, but I wouldn't say it because I don't know."

At another place in her testimony Miss Ross stated that she remembered several occasions when the car slid on the pavement. She also referred to the pavement as being icy where Mr. Hayes attempted to pass the truck. She was not sure whether it was packed snow or ice that caused the slippery condition of the roadway. Her testimony in this respect is as follows:

"Q. Is your testimony that there wasn't any snow on the pavement where he was going to pass?

"A. I don't remember whether it was packed snow or ice, but I remember getting out of the car and not being able to stand.

"Q. That is the only time anybody said anything to Mr. Hayes about his driving, is it?

"A. That is all I remember now."

Defendant Ault testified that he first saw the Dodge car when it was approximately 300 feet away and he

thought it was "backing out of a side road" as it was "generally crossways of the road." He also said he soon realized that it was skidding "and out of control."

Mr. Floyd R. Billings stated that he had visited Mr. Hayes at the hospital the day following the accident and that Mr. Hayes had told him that he (Hayes) "was on the wrong side of the road as he approached the curve". He further testified that a little later on the same day, and in the same place, he was talking with Mr. and Mrs. Hayes, and that she said, in the presence of Mr. Hayes, " 'Yes, Frank, [referring to Mr. Hayes] you were driving on the wrong side of the highway. * * * You had been driving on the wrong side a good many times and I had cautioned you about driving at the speed you were driving on the highway when it was frosty and icy, * * *. Prior to this accident we had another accident * * *. At that time you were driving at such a speed on the ice that you had no control of your car.' " Mr. Billings further testified that defendant Hayes had not denied the statements made by his wife.

Mr. Ernest R. Serber, the under-sheriff of Modoc county, California, was the only witness of the accident, other than the occupants of the Dodge and the driver of the truck. He was on his way to Portland and had followed the Consolidated Freightways' truck for three or four miles before the collision. The truck, he stated, had been traveling at a speed of 45 to 50 miles an hour and he had kept within 150 to 200 feet of the truck. When he first observed the Dodge it was going at an estimated speed of 40 miles an hour, and as it came around the curve it "was straddling the yellow line". He stated that in his opinion the Dodge skidded about 75 feet and the truck 35 feet, and that the truck

was going about 25 miles an hour at the time of the impact. After stopping for a short time where the mishap occurred, Mr. Serber proceeded north over The Dalles-California highway. He observed "dry spots and icy spots" along the highway, but he was unable to state where the icy places were or how many he saw. He did not describe the icy places. The condition of the roadway did not produce any change in his speed and he continued to drive from 45 to 50 miles an hour after leaving Algoma.

Mr. Orris Orville Moon was at Algoma shortly after the accident. He was an employee of the state highway department and his duties were to supervise the condition of the highway between Klamath Falls and Fort Klamath, a distance of approximately 37 miles. Wherever the road surface was slippery he sprinkled sand. At two or three places between Klamath Falls and Algoma he found slippery places where he placed sand. After briefly inspecting the automobiles involved in the accident, he proceeded some eight miles northward to Lamm's mill, but he found no icy places on the highway north of Algoma. He, however, did not travel on this portion of the highway until more than an hour after the accident.

Mr. Hayes was an experienced driver. The brakes and tires on his car were in excellent condition. The tires on the rear wheels had been driven less than 1,000 miles. There were no chains on the wheels of his car nor were there chains on the truck of the Consolidated Freightways. In fact there is no evidence in the case that any of the motor vehicles in that district were using chains or that by the use of chains driving would have been made any safer.

Before discussing the question of whether there is any substantial evidence of gross negligence on the part of the defendant Hayes, we shall consider defendant's objection to the admissibility of Billings' testimony as to what was said by Mrs. Hayes in the presence of her husband.

It is argued by defendant Hayes that in civil cases statements made to a third party by one spouse in the presence and against the interest of the other spouse, and not denied by the latter, are inadmissible in evidence. In support of this contention it is asserted that there is a disinclination on the part of one spouse to deny, in the presence of others, remarks made by the other spouse for the reason that it might threaten the peace of their marital relation, and therefore no inference is raised by silence.

■ The inadmissibility of statements under such circumstances is not without support. 20 Am. Jur., Evidence, § 567, p. 480. But the great weight of authority, as we shall hereinafter point out, is to the contrary.

Section 2-228, O. C. L. A., provides in part as follows:

"In conformity with the preceding provisions, evidence may be given on the trial, of the following facts:

\* \* \*

"(3) A declaration or act of another, in the presence and within the observation of a party, and his conduct in relation thereto;

\* \* \*"

Without discussing the reasons advanced by the defendant herein as to the inadmissibility of such testimony, this court in *Swain v. Oregon Motor Stages,* 160 Or. 1, 82 P. (2d) 1084, 118 A. L. R. 1225, ruled

that under the provisions of the foregoing statute, statements made by the wife in the presence of her husband were admissible. It was held in *Pugsley v. Smyth,* 98 Or. 448, 194 P. 686, and *Coles v. Harsch,* 129 Or. 11, 276 P. 248, that communications made by one spouse to the other in the presence of third persons are not privileged and therefore should not be excluded. See also in this connection *State v. Wilkins,* 72 Or. 77, 142 P. 589. The weight of authority is that statements of a husband or wife made in the presence of the other and not denied are admissible. Annot., Ann. Cas. 1918C, p. 34; 22 C. J., Evidence, § 356, at p. 322; 31 C. J. S., Evidence, § 294, at p. 1059; 20 Am. Jur., Evidence, § 567, p. 480.

Mr. Billings is the uncle of the plaintiff, Mildred Ross. His home is at Eugene, Oregon. When he heard of the accident he left immediately with plaintiff's mother for Klamath Falls, and arrived there late on the day of the mishap. He testified that Mr. Hayes, whom he had known for over 25 years, opened the conversation as to the accident. He further testified that Mr. Hayes stated to him that he, Mr. Hayes, "was going to pay for the nurses and pay for the doctor and the surgery, and he also emphasized at that time that if the doctors in Klamath Falls weren't able to perform the necessary work that they would obtain specialists."

■ The testimony as to the statements made by Mrs. Hayes in the presence of her husband was admissible in evidence under the almost unanimous ruling of the courts. No error was committed in admitting it. The weight to be given to it, however, is for the jury.

We shall revert now to the principal question in the case, to wit, whether there was substantial evidence

to support the charge of gross negligence on the part of defendant Hayes.

The complaint alleges that the defendant Hayes "was guilty of gross carelessness and negligence and reckless disregard of the rights of the plaintiff in the following particulars": First, that he drove the automobile "at a speed that was greater than was reasonable and prudent, having due regard to the traffic, surface and width of the highway and other conditions then existing"; second, that he drove the automobile at a speed that was greater than would permit him to exercise proper control of the vehicle; third, that he failed to keep and maintain a proper lookout for the condition of the road and the pavement at the time when he knew or should have known that the pavement was frosty and icy and dangerous to operate an automobile thereon except at a slow rate of speed; fourth, that he failed to keep and maintain a proper lookout for traffic on the highway; fifth, that he failed to drive his automobile on the right half of the highway; sixth, that he failed to observe and to heed the signs along the highway warning the motorist that the highway was "slippery when wet or frosty."

Section 115-1001, O. C. L. A., reads as follows:

"No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator or caused by his gross negligence or intoxication or his reckless disregard of the rights of others."

■ Plaintiff bases her right to recover against Hayes on the ground that he was grossly negligent in

the operation of the Dodge automobile. The statute does not define the term "gross negligence", nor has this court formulated a general definition of the term applicable to all cases. *Storm v. Thompson*, 155 Or. 686, 64 P. (2d) 1309. Whether the driver of an automobile should be held liable for gross negligence in its operation depends somewhat upon the particular circumstances of each case.

■ In *Rauch v. Stecklein*, 142 Or. 286, 20 P. (2d) 387, "gross negligence" is defined as follows:

" * * * Thus, gross negligence is conduct which indicates an indifference to the probable consequences of the act. A motor-host who drives in a manner which indicates that he has no concern for consequences and an indifference to the rights of others is said to be guilty of gross negligence. The injury which he inflicts is not entirely inadvertent. His mental qualities, therefore, differ from those of another who is guilty of only ordinary negligence. The condition of mind of the driver who plunges on ahead, grossly negligent of the rights of others, may not be such that we can say that his tortious acts are wilful or wanton, but his mind is at least indifferent to the rights of others or displays those rash qualities exhibited by the foolhardy."

The foregoing excerpt has been quoted with approval in *Hartley v. Berg*, 145 Or. 44, 25 P. (2d) 932; *Younger v. Gallagher*, 145 Or. 63, 26 P. (2d) 783; *Monner v. Starker*, 145 Or. 168, 26 P. (2d) 1097, and *Monner v. Starker*, 147 Or. 118, 31 P. (2d) 1109. See also *Layman v. Heard*, 156 Or. 94, 66 P. (2d) 492, where it is said that "we remain entirely satisfied" with the conclusion reached in Rauch v. Stecklein, supra.

This court in *Lee v. Hoff*, 163 Or. 374, 97 P. (2d) 715, had before it for consideration an instruction which, after giving a general definition of gross negli-

gence, concluded with these words: "It is something more than inattentions; in fact, it is the exhibition in the operation of a car of an I-don't-care-what-happens mental attitude." It was there said that the foregoing statement was not erroneous and finds support in *Storm v. Thompson,* supra; *Monner v. Starker,* 145 Or. 168, 26 P. (2d) 1097; *Cockerham v. Potts,* 143 Or. 80, 20 P. (2d) 423; *Rauch v. Stecklein,* supra, and *Storla v. S. P. & S. Trans. Co.,* 136 Or. 315, 297 P. 367, 298 P. 1065.

Mere proof that the driver of the automobile was guilty of ordinary negligence in the operation of the car does not require in all cases the submission to the jury of the question of whether he was guilty of gross negligence. "If in every instance where a guest succeeds in producing some evidence of ordinary negligence, as he has in the present instance, the court is required to submit to the jury the issue as to whether he has proved gross negligence, the above section of our laws will be deprived of a part of the usefulness which was expected of it." *Rauch v. Stecklein,* supra.

In the case at bar there is a total failure of proof of gross negligence on the part of defendant. The manner in which he operated the automobile did not indicate an indifference on his part to the probable consequences of his act or to the rights of others. Nothing connected with his driving resembled "an-I-don't-care-what-happens mental attitude."

There is no evidence that any protest was made of the manner in which Hayes was driving after they left the snow-covered highway. Statements made by Mrs. Hayes, with the exception of what was said about Mr. Hayes' driving on the wrong side of the highway, relate to the occasion when Mr. Hayes attempted to

pass the truck. Before this last-mentioned happening the Hayes party had traveled a distance of at least 45 miles over a roadway covered with snow without incident. The place where Mr. Hayes started to pass the truck was east of the mountains in a flat, level country. Failure of Hayes to drive his automobile on the right half of the highway did not, under the circumstances here existing, constitute negligence as a matter of law. *Weinstein v. Wheeler,* 135 Or. 518, 295 P. 196; *Hartley v. Berg,* supra.

Miss Ross was 21 years of age at the time of the accident and had driven an automobile since she was 18 years old.

The conclusion which we have reached in this case is not at variance with *Layman v. Heard,* supra, or *Melcher v. Adams,* 174 Or. 75, 146 P. (2d) 354, where, in each case, it was held that there was substantial evidence of gross negligence. In *Layman v. Heard,* supra, the court, after referring to prior decisions of this court defining gross negligence, said:

   " * * * Without reviewing these definitions once more, we express the belief that a driver who operates a car, some of the tires of which are smooth, at a speed of 40 to 55 miles per hour, over a roadway upon which icy stretches are occasionally encountered, is driving in a manner which can properly be deemed grossly negligent."

The foregoing quoted excerpt must be read in connection with the facts of the case. It appears that before the defendant started on the trip, his father had told him that "it is going to be icy this morning; you had better be careful how you drive." There were three in the automobile: plaintiff, defendant, and his sister, Mrs. Peterson. Both the plaintiff and Mrs.

Peterson protested many times to the defendant about the speed at which he was driving. This seemed to make him angry and instead of slowing down he drove faster. Before the accident, which occurred on an icy stretch of the highway, they had passed over five or six other icy places. The ice on the highway where the accident occurred was seen clearly a distance of 150 feet ahead of the car.

Adams v. Melcher, supra, also involves an accident which occurred on an icy stretch of the highway. In that case the plaintiff and defendant were returning from a trip to the coast and were near Portland when the mishap occurred. On the day of the accident there was "ice all along the sides of the road" between Portland and the Coast Range mountains. There were also according to the plaintiff's testimony "icy places" on the pavement, and the car had skidded on the ice at least once only a short distance from the place of the accident. The plaintiff had warned the defendant many times that he was driving too fast and requested him to reduce his speed. Each time the defendant, when requested, would slacken his speed and then shortly afterward resume the rate of travel to which the plaintiff objected.

In our opinion the circuit court erred in refusing to grant defendant Hayes' motion for a directed verdict. The judgment appealed from is therefore reversed and the cause remanded to the circuit court with directions to set aside the judgment against defendant Hayes and to enter judgment in his favor.

---

BELT, C. J., dissenting.

In considering whether the circuit court erred in submitting this cause to the jury, there are certain

fundamental legal principles which should ever be kept in mind. This court should not substitute its judgment for that of the jury on a question of fact. The evidence must be viewed in the light most favorable to the plaintiff. After verdict, the plaintiff is entitled to every reasonable intendment of the evidence. When reasonable minds might differ as to whether the defendant Hayes was guilty of gross negligence, under all the facts and circumstances of the case—viewed in the light most favorable to the plaintiff—the question is one of fact for the jury to determine. These principles are so well settled that citation of authorities in support thereof is deemed unnecessary.

In my opinion, there is some substantial evidence tending to show gross negligence on the part of the defendant Hayes. It was not necessary for plaintiff, in order to recover, to show wilful, wanton and reckless conduct equivalent to intentional wrong. Gross negligence is not to be confused with wilful misconduct for there is a clear distinction between the two terms. Gross negligence in this jurisdiction simply means a degree of negligence greater than ordinary negligence. It is a failure to exercise slight care: *Cockerham v. Potts,* 143 Or. 80, 20 P. (2d) 423. It is negligence which speaks of indifference to consequences: *Younger v. Gallagher,* 145 Or. 63, 26 P. (2d) 783.

The statement of facts in the majority opinion is exceptionally clear and accurate but, in my opinion, may well be amplified in a few particulars.

There is evidence tending to show that Hayes was driving on the wrong side of the highway as he entered this slight "S" curve at a speed of 40 to 45 miles an hour and that, suddenly confronted with the oncoming truck, he lost control of his car which skidded cross-

wise on the ice-covered pavement about 75 feet before the collision occurred.

On direct examiantion, the plaintiff thus testified about the happening of the accident:

"A. Well, we were driving along, we were visiting, and we came to this curve, Mr. Hayes wasn't on his side of the road, because I remember seeing the truck suddenly and feeling very uncomfortable, feeling that if we stayed where we were that we would be hit by the truck, and then it was a matter of seconds, I suppose, until the rear end of the car slid to the left and we slid across the highway and hit the truck, and that is all I remember then."

On cross examination:

"A. The reason I remembered that we were on the wrong side of the road was because when we saw the truck approaching I knew that if we stayed where we were we would be struck by the truck, so I very definitely remember that we were on the wrong side of the road and in a dangerous position.

"Q. Did you notice that you were on the wrong side of the road before that? A. Yes, I did.

"Q. Well, how far over on the wrong side of the road would you tell the jury that Mr. Hayes was driving? A. Mr. Hayes cut curves quite often."

While the curve was not an abrupt one, it is plain from the pictures introduced in evidence that a driver on the wrong side of the highway when entering a curve would not have a clear and unobstructed view of oncoming traffic. It is reasonable to suppose that, if Hayes could have seen the truck approaching when he first entered the curve, he would have driven on the wrong side of the highway? No, he was just "cutting the corner" and trusting that no other person using the highway would run into him.

Relative to the curve and the visibility afforded the motorist approaching from the north, Serber thus testified:

"Q. And so as shown in this picture one coming from the north would go down that highway and then make a turn this way (indicating) and come back. Is that right? A. Practically an 'S' curve.

"Q. What I am getting at is, when you are back in this direction—that would be south from the curve —how much vision have you got across that curve? Can you see way around the curve, both letter 'S's? A. *You can see a man coming around the curve if he is on his own side.*" (Italics ours.)

Billings testified that Hayes told him that "as he drove into the curve he was on the wrong side of the highway, and when he got into the curve *to where he could see the truck* the car went into a skid and turned crossways of the road and he could no longer see the truck, he was looking through the windshield out over the ditch, and he skidded from there on and the accident occurred." (Italics ours). Billings also testified that Mrs. Hayes, in the presence of her husband, said: " 'Yes, Frank, you were driving on the wrong side of the highway.' * * * You had been driving on the wrong side a good many times and *I had cautioned you about driving at the speed you were driving on the highway when it was frosty and icy,* * * *. Prior to this accident we had another accident * * *. At that time you were driving at such a speed on the ice that you had no control of your car'." (Italics ours).

Defendant Hayes offered no excuse or justification for being on the wrong side of the highway. He was not there by reason of any emergency. See Huddy, Cyclopedia of Automobile Law (Ninth Ed.) Vol. 3-4 p.

170, § 102. When he thus entered the curve, he was not in a position to see whether the road was clear of incoming traffic. As said in 42 C. J. 906, Motor Vehicles:

(§ 616 e) "When a motor vehicle is approaching or rounding a corner or curve there is a special necessity for keeping to the right-hand side of the road and the driver has not the right to drive on the left-hand side relying upon having time to turn to the right if a car approaching from the opposite direction comes into view."

(§ 618 g) "The circumstances may be such that driving on the left-hand side of the road will constitute negligence or even gross negligence. Thus, it is negligence for one to drive along the wrong side of the road when conditions are such that he is unable to see ahead of him. It has also been held that the fact that one was driving on the wrong side of the highway is prima facie, although not conclusive, evidence of negligence, and that driving on the wrong side of a highway contrary to statute is of itself negligence imposing liability for an injury resulting therefrom * * *."

Yet it is said in the majority opinion that "Failure of Hayes to drive his automobile on the right half of the highway did not, under the circumstances here existing, constitute negligence as a matter of law," citing *Weinstein v. Wheeler,* 135 Or. 518, 295 P. 196, and *Hartley v. Berg,* 145 Or. 44, 25 P. (2d) 932. I am unable to see where these two cases have any application to the facts herein. No collision was involved in either of those cases. True, a motorist may use any part of the highway as he sees fit so long as he has due regard for the rights of others using it. When the way is clear and the highway straight so the vision is not obstructed, it is not a violation of any legal duty to drive on the wrong side of the road, but

that is not this case. Here, we are concerned with a factual situation entirely different from that in either *Weinstein v. Wheeler,* supra, or *Hartley v. Berg,* supra.

To drive at a high rate of speed on the wrong side of the highway around a curve where the vision was somewhat obstructed and under the dangerous conditions shown to exist in the instant case is, in my opinion, evidence of gross negligence and manifests a reckless disregard of the right of others. At least, it is a question concerning which reasonable-minded persons might well differ—and is, therefore, a question of fact for the jury. There is evidence that defendant Hayes knew or, in the exercise of even slight diligence ought to have known, of the dangerous condition of the highway. In Shearman and Redfield on Negligence (Rev. Ed.) p. 50, § 24, it is said:

> "* * * Reasonable anticipation is that expectation created in the mind of the ordinary prudent and competent person as the consequence of his reaction to any given set of circumstances. If such expectation carries recognition that the given set of circumstances is suggestive of danger, then failure to take appropriate safety measures constitutes negligence. * * *"

Hayes had been warned about driving on the wrong side of the icy highway at an excessive speed. After leaving the mountains, the car had slipped several times on "icy patches". He undoubtedly must have seen the "icy patches" a few miles north of the scene of the accident. His experience in going into the snow while driving at 40 to 45 miles an hour over pavement covered with snow and ice ought to have been sufficient warning if any had been needed.

Mr. Serber, the under sheriff, testified concerning the condition of the highway as follows:

"Q. As you went north over that highway what was the condition of the highway as you proceeded north?  A. Well, it was the same as I had been traveling over.  There were dry spots and icy spots.

"Q. How frequently would you find those icy spots?  A. According to the condition of the road.

"Q. You wouldnt be able to say now how many you saw?  A. No, I couldn't.

"Q. Did you later on at any time run into any snow  A. Yes, I did."

It is 183 miles from Junction City to the place of the accident.  Plaintiff testified that they left Junction City at about 6 o'clock in the morning.  There is evidence that the accident occurred at about 10:30 A. M. Four stops were made en route which, it is reasonable to assume, occupied an hour's time.  Fifteen to thirty minutes elapsed before Hayes' car was pulled out of the snow bank.  Pictures were taken at Chemult and at another place.  Assuming four hours driving time, Hayes averaged about 45 miles an hour, much of the distance being over mountainous roads which, in many sections, were covered with snow and ice.  Finally, there is a reasonable inference of excessive speed on this trip.  True, Hayes' experience in the snow bank is quite remote but it was received without objection and is entitled to consideration.

Obviously, the decision in each case, on demurrer to the evidence, hinges upon its own particular factual situation.  *Layman v. Heard,* 156 Or. 94, 66 P. (2d) 492, is closely analogous.

In the Layman case, the party—including the plaintiff guest—was returning from a hunting trip in East-

ern Oregon in the month of November. The accident occurred 3.2 miles west of La Grande. The pavement was dry. *No ice was encountered between La Grande and the place of the accident.* Heard, on account of his experience prior to reaching La Grande, had general knowledge of the dangerous condition of the highway. As said in the opinion, "As the car was approaching this place at a speed of less than 50 miles per hour the plaintiff saw 50 yards ahead in the shade of some trees, an ice-covered area and called out, 'There's ice ahead. Look out!' Whether the defendant applied his brakes or not the plaintiff was unable to say, but when the car reached the ice it spun around and then hurtled down a sharp rocky decline at the side of the road, resulting in the injury of the three occupants." Heard was not on the wrong side of the highway and no collision was involved. There is evidence that the occupants of the car had often complained to Heard about his manner of driving but that he became angry and drove on—at times increasing his speed. The court properly held it was a question of fact for the jury, saying:

" * * * we express belief that a driver who operates a car, some of the tires of which are smooth, at a speed of 40 to 55 miles per hour, over a roadway upon which icy stretches are occasionally encountered, is driving in a manner which can properly be deemed grossly negligent. * * *."

In the instant case, Hayes, after being warned and after hearing the criticism of the "back seat drivers" did not become angry as Heard had done. He remained calm and stubbornly drove on, paying no attention to his critics. If it was proper to submit the Heard case to the jury—and I think it was—it seems to me the question of gross negligence here is one of fact and not of law.

As said in *Herzog v. Mittleman,* 155 Or. 624, 65 P. (2d) 384, 109 A. L. R. 662.

"  *   *   *   Where reasonable minds might differ as to what degree of negligence was established by the testimony, it is always a question of fact for the jury and not one of law for the court  *   *   *."

To the same effect, see *Storm v. Thompson,* 155 Or. 686, 64 P. (2d) 1309.

For these reasons, I dissent.