Argued December 4; affirmed December 18, 1945

## LAWRY *v.* McKENNIE ET AL.

(164 P. (2d) 444)

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY, LUSK and HAY, Associate Justices.

*Leo Levenson,* of Portland (with William J. Prendergast, Jr., and Irvin Goodman, both of Portland, on the brief), for appellant.

*Frank S. Senn,* of Portland (Senn & Recken, of Portland, on the brief), for respondents.

LUSK, J.

This is an appeal from a judgment of involuntary nonsuit in an action to recover damages for death by wrongful act.

The sole question for our determination is whether the plaintiff produced substantial evidence of gross negligence on the part of the defendants.

The case grows out of a collision between a horse ridden by a sixteen-year old boy, Victor Christensen, and a Ford truck owned by the defendant F. H. McKennie and operated by the defendant Conrad D. Smith as the latter's employe. Lillian Lawry, a twelve-year old girl, was a passenger on the truck, "riding as an invited guest" as the complaint alleges and the proof shows. She, Victor Christensen, and the horse were all killed in the accident. This action was brought by Joseph F. Lawry as administrator of the estate of Lillian Lawry, deceased.

The accident occurred on the afternoon of June 2, 1944, at a point about four and a half miles south of Oregon City on Highway 99 E. The day was clear. Smith was driving north to Portland, hauling a load of cordwood. The horse and rider were approaching the truck from the opposite direction. They were on the same side of the highway as the truck—the east side—but on the shoulder to the truck's right. The collision occurred on the paved portion of the highway.

The complaint charges that the defendants were guilty of gross negligence in operating the truck at a dangerous rate of speed, in failing to stop when the driver knew or should have known that the truck was frightening the horse, and in failing to keep the truck under control.

On the trial two eye witnesses to the accident testified—Carl Christensen, the father of the boy who was killed, and the defendant Smith, who was called by the plaintiff as an adverse witness. The only other witness on the question of negligence was H. L. Benninghoff, a state police officer who came to the scene of the accident about three and a half hours after it occurred.

The witness Christensen operated a tavern located on the east side of the highway something less than a quarter of a mile south of the point where the accident occurred. In the vicinity of the tavern the highway, as it goes north, begins to rise on a gradual grade which continues for a distance of well over a quarter of a mile, and, at the time of the accident, the truck was going up hill and the horse coming down. Christensen testified that he stood on the west side of the highway opposite the tavern and watched his son as he rode north and as he was returning. He observed the truck as it passed him, and says that as it went up the hill its speed was about forty-five miles an hour. The horse was on the shoulder as it approached the truck and was being ridden at a trot. When the truck was about 100 feet from the point of impact it veered from side to side, cordwood was flying from it, and he saw the truck strike the horse. Asked what part of the truck struck the horse he said, "the front part, the radiator and the fender". He

indicated by a mark on a photograph that the point of collision was a short distance west of the east edge of the paved portion of the highway. He swore that the truck did not slow down until it began to veer. He could not say how many times it veered back and forth. He went immediately to the scene of the accident, and said that he found scattered wood from the truck for about 100 feet, "though I may be a little mistaken on that". The horse was in the ditch with the truck.

The following testimony is taken from his cross-examination:

"Q You saw the truck there? Do you mean to say he pulled to the left?

"A Yes, to the left, and to the right, and that is when the wood started flying off.

"Q Did he get over the center line?

"A Yes, yes, he switched over to the other side.

"Q How far did he get over the center line, if at all?

"A Well, I would not say he went over the center line but he was in the middle of the road for awhile.

"Q You mean with his wheels?

"A Yes, sir.

"Q And other cars were coming toward it, and they passed?

"A Yes, sir.

\* \* \* \* \*

"Q Isn't it a fact that the horse reared up about the time the truck and the horse came together?

"A No, the horse did not rear up. It might have got frightened seeing the wood flying off, and the driver got confused, but the horse was not in the habit of doing anything like that.

"Q In fact, the horse got out on the pavement and collided with the truck didn't it?

"A I don't know how that was done.

"Q At any rate, the horse got out on the pavement and collided with the truck?

"A No, I think they both got confused and they just—

"MR. SENN: I move to strike that out as a conclusion.

"THE COURT: State just what happened and not what you think happened.

"MR. SENN: Q Isn't it a fact, that the wood began to fall off just about the time of the impact?

"A No, I don't see why it would.

"Q When the impact came, of course, the truck went out of control and went into the ditch, on the right-hand side, didn't it?

"A Yes, it—the truck was in the ditch.

"Q On its right-hand side?

"A Yes."

The testimony of the defendant Smith was in substance as follows: The deceased girl, Lillian Lawry, and another young girl had ridden with him on the day of the accident from Portland to Hubbard, which is south of Oregon City, where he loaded the truck with wood. The truck was a ton and a half 1933 Ford, and was loaded with three cords of wood weighing six and a half to seven tons. On the return trip Lilliam Lawry sat on the right-hand side of the driver's seat. Driving up the hill on which the accident occurred he was in third-gear—"that was all the faster it would go up the hill". He estimated the grade to be about eight per cent. He first saw the horse and rider when they were about 200 feet away. His speed was then twenty-five miles an hour. The horse was on the shoulder (which was about six feet wide) gallop-

ing as fast as he could go, but did not appear to be excited. Upon seeing the horse, Smith decreased his speed to between eighteen and twenty-two miles per hour. He testified:

"Q What did you do when you saw this horse, two hundred feet ahead of you?

"A I merely pulled over to the yellow line, on my left and gave him all the room I could.

"Q Did you slow the truck down?

"A Yes, sir.

"Q How slow did you slow it?

"A I could not say.

"Q What was the horse doing when you started to slow down?

"A Running down the side of the road.

"Q Was it walking or galloping?

"A Galloping.

"Q Was the horse excited?

"A No, it did not seem to be."

There was considerable opposing traffic and he could not get farther over to his left because of another truck which was approaching from the north. When the horse came opposite the truck "it reared up and came down on the cab". The front end of the truck did not come in contact with the horse. He identified two photographs of the truck taken after the accident. The bumper does not appear to have been touched. The upper portion of the radiator is pushed over towards the left front fender, lying almost against it. The front corner of the roof of the cab has a great dent in it and is folded down over the windshield. The windshield is shattered. Smith testified that after the impact he lost control of the truck, which moved thirty feet into the ditch carrying the horse with it on top (meaning, evidently, on top of the hood). The radiator was bent in the manner

described above when the horse fell upon it. The truck did not "weave", and, heavily loaded as it was, could not have done so without causing a blowout. Some of the load fell off after the impact.

The witness identified a photograph of the highway taken at the scene of the accident and showing marks of a double track leading from the pavement in a northeasterly direction at about a forty-five degree angle across the shoulder into the ditch, and testified that these were marks made by the dual wheels on the right rear of the truck. He placed the point of the collision well to the west of the shoulder.

State Police Officer Benninghoff testified to a statement made by Smith in the hospital after the accident. He said he asked Smith how fast he was driving, and Smith answered, "Reasonable, like everybody else, thirty-five miles on the highway".

"Q Did he say to you that he did not see the horse until he was on top of it?

"A Did not see the horse until he got right there, yes.

"Q Did he also say at that time he was driving about thirty-five miles an hour?

"A He said he was driving thirty-five miles on the highway. Whether he was driving that at the time of the impact—going up that short hill his speed may have been decreased, of course."

Benninghoff further testified that there was "a lot of wood" where the truck went into the ditch and a lesser amount to the south, a distance of about twenty feet.

We believe that the foregoing is a fair statement of the substance of all the evidence relevant to the question of liability in this case.

Since the deceased Lillian Lawry was being transported in the truck as a guest, there can be no recovery for her death without substantial evidence that it was caused by "gross negligence" or "reckless disregard of the rights of others". § 115-1001, O. C. L. A. The terms which we have quoted have heretofore been defined and explained in numerous decisions of this court, the latest of which is *Ross v. Hayes,* 176 Or. 225, 157 P. (2d) 517, 158 A. L. R. 452, and it is unnecessary to repeat what we have heretofore said on the subject.

■ We are clearly of the opinion that, whatever might be thought if the question were one of *ordinary* negligence, there is no evidence of *gross* negligence in the record before us. It cannot be said that the defendant Smith's driving indicated a mind "indifferent to the rights of others" or having "those rash qualities exhibited by the foolhardy" *(Rauch v. Stecklein,* 142 Or. 286, 294, 20 P. (2d) 387) or an "I don't-care-what-happens mental attitude" *(Lee v. Hoff,* 163 Or. 374, 390, 97 P. (2d) 715.) On the contrary, all evidence shows that even before anything had occurred to make an accident seem probable Smith took the precaution to check his speed and steer his truck as far from the path of the horse and rider as he safely could. The utmost that could be charged against him is that, accepting as true Christensen's testimony that wood began to fall from the truck as it moved towards the center of the highway, Smith's failure immediately thereafter to apply his brakes and bring his truck to a stop was evidence of ordinary negligence. We are not called upon to say whether that would be true or not, and content ourselves with the statement that in our opinion his failure to stop did not constitute gross negligence.

■ Counsel for the plaintiff call attention to § 115-333, O. C. L. A., which prescribes rules of conduct for motorists passing or meeting horses or other animals on the highway. That section provides: .

"The operator of a motor vehicle shall, on a signal, by raising the hand, from a person riding, leading or driving a horse or horses or other animals in the opposite direction, bring such motor vehicle immediately to a stop, and remain stationary so long as may be reasonable to allow such animal or animals to pass, and, if traveling in the same direction, shall use reasonable caution in passing such animal or animals; provided, that in case such animal or animals appear badly frightened or the person operating such motor vehicle is signaled so to do, such person shall cause the motor of such vehicle to cease running so long as shall be reasonably necessary to prevent accident and insure the safety of others."

We think the foregoing statute is without application here because no signal was given by the rider of the horse, and there is no evidence that the horse appeared to be badly frightened or frightened at all. The affirmative evidence is to the contrary.

The cases cited by the plaintiff are not in point, first, because they do not involve gross negligence, and, secondly, because they are all distinguishable on their facts. In *Spangler v. Markley,* 39 Pa. Super. 351, the motorist had stopped his car in obedience to the signal of the driver of a horse and buggy. It was dark and there were no lights on the automobile. While the plaintiff was getting out of the buggy in order to go to the head of the horse, the defendant suddenly started the motor and approached the buggy with considerable noise, causing the horse to shy. In *Pfeiffer v. Radke,* 142 Wis. 512, 225 N. W. 934, the

plaintiff, on the approach of an automobile, pulled his horse to the right of the highway as far as he could get, and stopped. The road was twenty-two feet in width, and the motorist drove from his right side over to the left, and passed the horse and buggy within one or two feet, splashing water and slush toward the horse, and frightening him. In *Browne v. Thorne,* 61 Wash. 18, 111 P. 1047, the plaintiff, when her horse became nervous, signalled for an approaching motorist to stop, but he gave the signal no heed. In *Holloway v. Barnes Grocer Co.,* 223 Mo. App. 1026, 15 S. W. (2d) 917, there was evidence that the driver of a truck, to which was affixed a large white flapping tarpaulin, continued to drive after a horse, which was being ridden on the highway, showed signs of fright and uneasiness at the approach of the truck.

In all the foregoing cases it was held that the question of negligence was for the jury; but the bare statement of the facts suffices to show how different they are from the instant case.

■ There is no substantial evidence in the record that the truck struck the horse. The testimony of Mr. Christensen that it did must be disregarded, for he was on the opposite side of the road nearly a quarter of a mile away. At the moment of impact the truck was between him and the horse, and necessarily cut off his view of the actual collision. He, in effect, admitted as much in a portion of his testimony which we have quoted. The only testimony, therefore, as to what happened at the moment of impact is that of the defendant Smith, and he is strongly supported by the evidence of the photographs of the truck in its damaged condition. If the horse had stayed on the shoulder there would have been no accident, for all

the evidence is that the truck was on the pavement when the collision occurred. Of course, if the defendant Smith had been guilty of some act of gross negligence in the operation of the truck which frightened the horse, the fact that the truck did not strike the horse would become immaterial. But it was not gross negligence for Smith to drive up the hill at forty-five miles per hour—if he did so; or at eighteen to twenty-two miles per hour, which the evidence shows to have been his speed immediately before the accident. There is nothing to support the claim that the defendant Smith did not keep a proper lookout. He testified that he saw the horse when it was 200 feet away, and his action in steering the truck toward the center of the highway, as testified to by both Christensen and himself, tends to support him. Benninghoff's testimony that Smith told him he did not see the horse "until he got right there" cannot be construed as impeachment of Smith upon this issue.

Finally, as we have said, there is no evidence that the horse was excited or appeared to be so. It is not suggested that he was running away, or out of control of the rider. Even though it could be said Smith failed to exercise reasonable prudence to avoid injury to the horse and its rider, as it was of course his duty to do; he did not, nevertheless, under the evidence here, act with reckless abandon or as though their safety was a matter of indifference to him.

Hence, there is no proof of gross negligence, and the judgment is affirmed.